## A09A1467. ADCOX v. ATLANTA BUILDING MAINTENANCE COMPANY, INC.
### (687 SE2d 137)

ADAMS, Judge.

Timothy Adcox alleges that he slipped and fell on ice in his employer's parking lot. He brought suit against his employer's janitorial services contractor and subcontractor because the ice allegedly formed when used mop water was discarded in the parking lot. Both contractor and subcontractor moved for summary judgment. The contractor argued that it did not owe a duty to Adcox because it did not own or occupy the premises and it was not responsible for its subcontractor's actions. The trial court granted the contractor's motion and denied the subcontractor's motion. Adcox appeals the ruling in favor of the contractor. We affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citations omitted.) *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

Construed in favor of Adcox, the evidence shows that he was employed by ADT Security as a service manager. On Sunday night, January 23, 2005, between 8:00 and 10:00 p.m., the 44-year-old Adcox received a call that an alarm had gone off in the ADT building indicating that the back door sensor had been tripped. Adcox asked that the police be sent, and he went there himself after the police had a chance to inspect. It was a very cold and windy night, but it had not been raining. Adcox normally parked out front, but, because the back door was indicated, he drove around back and parked near the back stairs. At the back of the ADT facility, there are two doors about one

door width apart about loading dock height; they both open onto a small landing surrounded by a metal railing with about six or seven metal stairs running down from the middle of the landing to the parking area for the loading dock.

Adcox parked one car spot to the right of the stairs and walked directly left of his car toward the stairs. After about three or four steps, Adcox slipped and fell on ice and slid up against the bottom steps. He landed flat on his back. After he got up, he saw ice on the ground and ice on the steps. There was less ice on higher stairs and no ice on the landing. The ice on the pavement extended straight out from the stairs, with some under the bottom stairs as well. He continued on his mission, but he did not go up the stairs; rather, he drove around and entered through the front door. He turned the alarm off, inspected the office for problems, but did not see anyone in the building. Adcox alleges that he suffered injuries as a result of the fall.

Some time prior to his injury, ADT had hired Atlanta Building Maintenance Company, Inc. ("ABM") to perform the janitorial services at the building. ABM, in turn, subcontracted the work to J. M. S. Building Maintenance, Inc. ("JMS"). In that regard, ABM and JMS entered into an agreement entitled "Independent Contractor Agreement" dated April 17, 2003 and signed by Carlos Mesa. Mesa testified that JMS employed five or six people in January 2005, but only one employee was on the ADT premises on the night in question.[1] Mesa had trained that person on how to do his job, including telling him how and where to dispose of mop water. Mesa instructed that the dirty mop water should be dumped out the back door "over the railing to the side of the building." This area is to the side of the steps. He added that it should be close to the dumpster ". . . between the dumpster and the dock door," that it should be thrown over the rail some distance rather than poured straight down, and that it should be away from the building. He never instructed the employee to throw the water down the stairs nor over the front railing nor where a person would walk to the stairs from the parking lot. Mesa also instructed that the employee could walk away from the building and to a grassy area across the parking lot to dump the water. The choice between the two was the employee's, and, according to Mesa, it depended on what was near the stairs and "common sense." Mesa did not give special instructions for disposing of the water in cold temperatures. Finally, Mesa admitted that the interior security camera system at ADT captured a picture of a JMS

---

[1] There may have been two employees other nights, but there is no nonhearsay evidence in the record that two were there that night.

employee near a mop bucket; the picture is time stamped as 7:31 that evening. And Mesa admitted that his employee threw water somewhere out of the back of the building that night. Adcox alleges the water turned to ice and that he slipped on that ice.

1. Adcox contends the trial court erred by granting summary judgment in favor of ABM because ABM owed a duty of care to keep the premises safe and breached that duty. Adcox does not claim that ABM owed a duty as an "owner" or "occupier" under OCGA § 51-3-1. Rather, he claims that ABM is liable because "janitorial contractors, such as ABM and JMS, have a duty to use ordinary care in providing janitorial services" and that there is an issue of fact as to whether it breached that duty. But even assuming the duty, Adcox has no evidence that ABM actually provided any janitorial services to ADT other than through its independent contractor.

Janitorial service contractors whose actions cause injury to a third party certainly can be held liable to those parties. See *Kelley v. Piggly Wiggly Southern*, 230 Ga. App. 508 (496 SE2d 732) (1997) (circumstantial evidence of a connection between *both* contractors and the cause of the plaintiff's fall). But there is no allegation in this case that ABM threw out the mop water or otherwise acted negligently so as to cause Adcox's injuries. The only suggestion of ABM playing a role related to the alleged fall is Mesa's testimony that ABM said the mop water could be discarded in the back of the building. This is insufficient to support liability. Adcox has not shown that there was anything wrong with that instruction. He has presented no nonhearsay evidence to show that ADT objected to discarding the water out back or that ABM had any knowledge that JMS was allegedly disposing of the water in a dangerous manner. Also, Mesa did not aver that ABM told him where in the back of the building the water could be thrown nor give him any instruction on what to do in cold weather. Thus Adcox has not shown that ABM breached any duty by recommending that the mop water could be discarded somewhere out back, and, accordingly, Adcox has no claim against ABM for negligence arising out of its own actions.

2. Adcox contends there is a question of fact as to whether ABM is vicariously liable for JMS's actions. With regard to vicarious liability, in Georgia "[a]n employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." OCGA § 51-2-4. This rule applies to janitorial contractors who retain independent subcontractors to actually perform the work. See, e.g., *Braswell v. Foodmax of Ga.*, 225 Ga. App. 463, 466 (2) (484 SE2d 86) (1997) (janitorial contractor not liable for torts of independent subcontractor).

In janitorial service cases, the standard test applies for deter-

mining whether the subcontractor is an independent contractor. See, e.g., *Feggans v. Kroger Co.*, 223 Ga. App. 47 (476 SE2d 822) (1996). That test asks "whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work as distinguished from the right merely to require certain definite results in conformity to the contract." (Citations and punctuation omitted.) *Ross v. Ninety-Two West, Ltd.*, 201 Ga. App. 887, 891 (3) (412 SE2d 876) (1991). And, "[if] the contract . . . clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control." Id. Adcox contends there is a conflict in the evidence regarding whether ABM retained or exercised sufficient control of the time, manner and method of cleaning the premises. We disagree.

(a) The agreement between ABM and JMS is entitled "Independent Contractor Agreement" and it states that the parties intended that JMS be an independent contractor:

> The parties intend that the Contractor, in performing services herein specified, shall act as an independent contractor and shall have control of his/her work and the manner in which it is performed.

Although ABM retained "a general power of supervision, to ensure that the work conforms to the contract, including the right of inspection and the right to request corrections of work as needed," retention of the right to require certain definite results in conformity to the contract does not defeat independent contractor status. *Feggans*, 223 Ga. App. at 48-49.

> It is well recognized that merely taking steps to see that the contractor carries out his agreement, by supervision of the intermediate results obtained, or reserving the right of dismissal on grounds of incompetence, is not such interference and assumption of control as will render the employer liable.

(Punctuation omitted.) *Slater v. Canal Wood Corp. &c.*, 178 Ga. App. 877, 881 (1) (345 SE2d 71) (1986). See also *Cotton States Mut. Ins. Co. v. Kinzalow*, 280 Ga. App. 397, 401 (634 SE2d 172) (2006).

The contract further provides that JMS was free to contract with others; that JMS was "not an agent or employee of ABM" and not entitled to ABM employee benefits; and that ABM had no right to control "the manner in which the work is to be done and shall, therefore, not be charged with the responsibility of preventing risk to

the contractor or his/her employees." Rather, JMS had full authority and responsibility over its employees, including hiring and firing. The agreement provides that JMS would indemnify, defend and hold harmless ABM from any claims from any other source arising out of the contractor's actions and that JMS would obtain insurance to fully protect both JMS and ABM from such claims. In connection with services performed under the agreement, the contract states that the premises "shall be under the exclusive management and control of [JMS], except" in connection with ABM's general power of supervision quoted above. These provisions clearly and thoroughly provide for an independent contractor relationship. See, e.g., *Cotton States*, 280 Ga. App. at 401-402.

Adcox argues that, under the agreement, ABM retained control over the time, manner and method of JMS's work because the contract mentions separate "plans and specifications":

> Contractor agrees to perform any and all services generally performed by Contractor in his/her usual line of business (or required or requested by ABM or necessary for the completion of the project according to plans and specifica- tions given to subcontractor) including, but not limited to, the following: General cleaning i.e. dusting, vacuuming, sweeping, general lavatory cleaning, etc. . . .

But these plans and specifications are not in the record and there is no evidence of spoliation that would give rise to a presumption or inference. See generally *Lane v. Montgomery Elevator Co.*, 225 Ga. App. 523, 525 (1) (484 SE2d 249) (1997).[2]

In short, given that "the contract . . . clearly denominates the other party as an independent contractor, that relationship is pre- sumed to be true unless the evidence shows that the employer assumed such control." *Ross*, 201 Ga. App. at 891 (3).

(b) Here, the undisputed evidence shows that ABM did not assume such control. An employer is liable for the negligence of a contractor "[i]f the employer . . . interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference." OCGA § 51-2-5 (5). Adcox contends that ABM assumed such control by telling JMS "exactly how to clean the property, including where to discard the used mop water." The facts show otherwise.

Mesa averred that he received his instructions from ABM: "they showed me what to do," including all the areas that needed cleaning.

---

[2] Mesa recalls receiving that information in writing, but he no longer has it.

ABM instructed him that JMS would be responsible for emptying the trash cans, vacuuming, dusting, mopping the floors, and cleaning the breakrooms and bathrooms. These instructions merely repeat the broad requirements of the contract, which tell JMS where to clean and the general scope of the work. They do not dictate the time, manner or method of executing the work.

ABM told Mesa the days that cleaning was needed and that it had to be completed outside of normal business hours, which were Monday through Friday, 8:00 a.m. to 5:00 p.m. Although Mesa stated that ABM told him the hours to work, he explained that he did not keep track of employee hours worked nor pay by the hour because the employees "don't have to spend any time, just do their job and leave." In fact, the ADT office is small, and it only took one person about an hour and a half to clean it. This evidence does not create an issue of fact regarding whether ABM dictated the time JMS was required to perform the work. Instructions such as giving a deadline for performance or requiring that work be completed at night or before the open of business each day do not amount to control over the time of the work because they do not purport to "control specifically when any particular duties were to be performed." *Feggans*, 223 Ga. App. at 48 (requiring work between 11:00 p.m. and 7:00 a.m. insufficient to defeat independent contractor status). See also *Larmon v. CCR Enterprises*, 285 Ga. App. 594, 596 (647 SE2d 306) (2007) (contract required delivery by a certain time but the manner and method of performing the contract were left to the contractor's discretion).

Although ABM had someone observe JMS's work from time to time, ABM did not provide a regular on-site supervisor. The ABM observer would check whether the dusting, mopping and other work was satisfactory. In this vein, Mesa testified that he understood ABM had the right to direct his company as to how the job was to be performed. This is consistent with the contract language that gave ABM the right "to ensure that the work conforms to the contract, including the right of inspection and the right to request corrections of work as needed." Again, the general right of inspection to ensure conformity to the contract does not preclude an independent contractor relationship. See *Slater*, 178 Ga. App. at 881 (1); *Feggans*, 223 Ga. App. at 49. "Such activity evidences [ABM's] right to require certain results under its agency contract, as opposed to its controlling of the time, method and manner by which the results are achieved." *Cotton States*, 280 Ga. App. at 401.

Under the contract, JMS was required to use its own materials, tools, and equipment except that JMS could borrow or rent equipment from ABM. Despite the contract language, ABM in fact

YALE LAW LIBRARY

provided all of the equipment that JMS used at the job site, such as vacuum cleaner, mop, and buckets. JMS provided only the labor. But, ABM's "willingness to supply these materials to its agents does not intrude into the agents' ability to control the daily operations of his business." *Cotton States*, 280 Ga. App. at 401.

Finally, Mesa had a conversation with ABM about where the used mop water would be discarded. He does not remember the content of the conversation, except he recalls that ABM indicated the water could be discarded in the back of the building. Jeremy Fort, the ABM manager of the ADT account, added that he never instructed Mesa to discard the water "over the rail at the stairs at the rear of the building." Given the explicit terms of the contract and the other facts and circumstances, we find ABM's indication that the mop water could be discarded in back of the building was insufficient as a matter of law to constitute an assumption of control by ABM "so as to create the relation of master and servant or so that an injury results which is traceable to [its] interference." OCGA § 51-2-5 (5). Rather, it is no more than a general indication that the mop water could be discarded in back of the building. Under the contract, ABM had delivered full and complete possession of the premises to its independent contractor JMS, and it was Mesa, on behalf of JMS, who gave the worker the specific instructions about where to discard the water.

*Judgment affirmed. Blackburn, P. J., and Doyle, J., concur.*

DECIDED NOVEMBER 16, 2009.

*Gray, Rust, St. Amand, Moffett & Brieske, Michael D. St. Amand*, for appellant.

*Dickerson & Van Sant, David M. Van Sant, Hamilton, Westby, Antonowich & Anderson, Andrew J. Hamilton, John C. Hillis, Hall, Booth, Smith & Slover, Denise W. Spitalnick*, for appellee.